Brian S. King, #4610
Brent J. Newton, #6950
Tera J. Peterson, #12204
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
tera@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| R.B., individually and on behalf of S.B. a minor,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>BLUE CROSS BLUE SHIELD of MICHIGAN, NEW DIRECTIONS BEHAVIORAL HEALTH, the NORTHPOINTE BANK BENEFITS PLAN, and NORTHPOINTE BANK.<br><br>　　　　　Defendants. | COMPLAINT<br><br>Case No. 2:23-cv-105 |

Plaintiff R.B., individually and on behalf of S.B. a minor, through his undersigned

counsel, complains and alleges against Defendants Blue Cross Blue Shield of Michigan

("BCBSMI"), New Directions Behavioral Health ("New Directions"), the Northpointe Bank

Benefits Plan ("the Plan"), and Northpointe Bank ("the Plan Admin") as follows:

//

1

//

## **PARTIES, JURISDICTION AND VENUE**

1. R.B. and S.B. are natural persons residing in Palm Beach County, Florida. R.B. is S.B.'s father.

2. BCBSMI is an independent licensee of the nationwide Blue Cross and Blue Shield network of providers and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. Some of the appeals in this case were processed by New Directions instead of BCBSMI. New Directions is identified in the appeal correspondence as "perform[ing] managed behavioral health care services on behalf of Blue Cross Blue Shield of Michigan, the insurance company for your health insurance plan."

4. At all relevant times BCBSMI acted as agent for the Plan and the Plan Admin.

5. The Plan Admin is the designated administrator for the Plan.

6. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). R.B. was a participant in the Plan and S.B. was a beneficiary of the Plan at all relevant times. R.B. and S.B. continue to be participants and beneficiaries of the Plan.

7. S.B. received medical care and treatment at Heritage School Residential Treatment Center ("Heritage") from July 24, 2020, to October 28, 2020, and Change Academy Lake of the Ozarks ("CALO") from October 30, 2020, to October 9, 2021. These are treatment facilities, which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. Heritage is located in Utah County, Utah, and CALO is located in Missouri.

8. BCBSMI and New Directions denied claims for payment of S.B.'s medical expenses in connection with her treatment at Heritage and CALO.

9. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

10. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because BCBSMI does business in Utah through its network of affiliates, as do NorthPointe Bank and New Directions, and because a portion of the treatment at issue took place in Utah.

11. In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs he will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both R.B. and S.B.'s privacy will be preserved.

12. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against the Plan Admin pursuant to 29 U.S.C. §1132(c) based on the failure of the agents of the Plan Admin, to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

//

## BACKGROUND FACTS

### S.B.'s Developmental History and Medical Background

13. S.B.'s biological mother did not seek prenatal care and abused drugs and alcohol while pregnant. S.B. had a brain bleed at birth and only weighed four pounds and ten ounces. She stayed in the hospital for ten days. R.B. adopted S.B. at the time she was five days old.

14. Around the time that she started the first grade, S.B. started showing symptoms of anxiety. She began biting and sucking on her shirt and refusing to go to school. S.B. started meeting with a therapist.

15. S.B. had difficulty regulating her emotions and often experienced emotional outbursts. She was caught sending a nude picture of herself to a peer and in December, 2018, she was suspended from school after getting into an altercation with another student.

16. S.B. would often become enraged and would frequently become physically aggressive at home. She acted depressed and it was discovered that she had been self-harming by cutting.

17. S.B. was given a neuropsychological evaluation and began meeting with a psychologist. S.B. was given an individualized education plan at school but she continued to struggle academically.

18. S.B.'s psychiatrist prescribed various medications, but she continued to experience depression, anxiety, low self-esteem, suicidal ideation, and had difficulty focusing. S.B. isolated herself in her room, and when she did go out it was often to abuse substances with friends.

19. S.B. was found using marijuana in her bedroom, and was caught sending an inappropriate video to a boy at school. She continued to self-harm and to act out.

20. S.B. was withdrawn from school and placed in an outdoor behavioral health program called Trails Carolina. S.B.'s treatment team at Trails recommended that she receive additional treatment following her discharge and she was sent to a facility called New Leaf Academy.

21. S.B. was put on a new medication at New Leaf, but had a severe reaction to it and her depression, anxiety, and suicidal ideation significantly increased.

22. She attempted to jump off of a porch and was able to grab a pair of scissors that she used to cut herself severely enough that she was taken to the hospital. New Leaf refused to take S.B. back after this incident.

23. S.B. spent thirteen weeks at the University of Utah's University Neuropsychiatric Institute ("UNI"), which was much longer than the typical stay there. S.B. sabotaged her treatment progress and at times needed to be restrained and have special interventions put into place to keep her safe.

24. After her discharge, many programs refused to admit S.B. due to her acuity. Heritage was chosen to treat S.B. due to its focus on treating neurodivergent children.

### Heritage

25. S.B. was admitted to Heritage on July 24, 2020, with BCBSMI's approval.

26. In a letter dated September 17, 2020, BCBSMI affiliate New Directions denied payment for S.B.'s treatment at Heritage. The letter stated in pertinent part:

> New Directions has reviewed all information submitted by the provider and/or facility for Residential Treatment services on Friday, July 24, 2020.

Based upon that review, this letter confirms that New Directions has determined that Residential Treatment services provided on September 17, 2020 to discharge at Heritage Residential Treatment Center are not medically necessary.

Specifically, the clinical information that New Directions received did not meet Medical Necessity according to New Directions Medical Necessity Criteria for Psychiatric Residential Criteria. After reviewing New Directions Medical Necessity Criteria that takes into account age, progress of treatment, diagnosis and other programs available, we have determined that your care can be provided in a less intensive restrictive setting, such as Psychiatric Partial Hospitalization due to the following reason(s):

Heritage Residential Treatment Center asked for approval to provide care for you. You were admitted for treatment of depressed mood and self-harm. Your care team reports your symptoms have improved. You can continue your treatment in a less restrictive treatment setting. Please follow up with your care team for the next steps in your care.

27. On June 21, 2021, R.B. submitted a level one appeal of the denial of payment for S.B.'s treatment. R.B. wrote that he was entitled to certain protections under ERISA during the review process, including a full, fair, and thorough review conducted by appropriately qualified reviewers, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

28. R.B. included medical evaluations and letters of medical necessity with the appeal. A neuropsychological evaluation conducted in February and March of 2019, stated in part:

[S.B.] demonstrates a number of traits that are at risk for becoming extremely problematic in nature and may lead to a safety risk if not directly addressed in the very near future. Treatment efforts are likely to produce optimal results if they are oriented toward modifying these maladaptive features. If not addressed, [S.B.] is at heightened risk for continuing her pattern of behavioral dysregulation. There is a need for ongoing treatment to address [S.B.]'s cognitive, emotional and behavioral development and areas vulnerability. [S.B.] requires positive skills and behaviors in her daily repertoire to continue to build her self-esteem and level of personal responsibility to prepare for adulthood.

29. In a letter dated March 13, 2020, Tara Zuckerman, Psy.D., wrote in part:

> This letter is being written on behalf of [S.B.]. An initial evaluation with [S.B.] and her parents was conducted on March 6, 2019. [S.B.] and her parents reported that [S.B.] suffers with significant anxiety, sadness, and emotional dysregulation. At that time [S.B.] enrolled in weekly cognitive behavioral therapy (CBT) in order to develop coping strategies to address these difficulties.
>
> Throughout the course of treatment [S.B.] continued to struggle, engaging in self-harming and high-risk behaviors. Clinicians carefully think through decisions about higher level of care [sic] before making such recommendations. With [S.B.]'s continued difficulties, a higher level of care was recommended, as it was believed necessary in order to best address the severity of her symptoms. This clinician last saw [S.B.] on October 25, 2019. It is strongly recommended she continue at this level of care until symptoms are sufficiently resolved, as failure to do so may result in deterioration of her functioning.

30. In an undated letter, Brianna Davis LCSW wrote in part:

> [S.B.] enrolled at Spark Academy at Heritage Schools for a history of unsafe behaviors such as self-harm, suicidal ideation and attempts; poor self-regulation marked by periods of intense sadness followed by extreme impulsivity and unsafe behavior; and a difficulty forming and maintaining healthy relationships with peers and family members. Prior to her enrollment at Heritage, she had been enrolled in a wilderness program due to unsafe behaviors at home, and a recommendation was made to enroll in a therapeutic boarding school. [S.B.] enrolled at New Leaf Academy, but was not able to remain safe due to the intensity of her behaviors, and she was placed in the CAT program at the Huntsman Mental Health Institute (formerly known as the University Neuropsychiatric Institute). Due to continual struggles with her safety-interfering behaviors, [S.B.] was placed in our residential treatment program at Spark Academy.
>
> [S.B.] received 60 minutes of individual therapy, 60 minutes of family therapy, and 120 minutes of group therapy from me each week. Due to her patterns of self-harm, putting herself in dangerous situations, physical aggression, and running away from staff, she was placed on a probationary status with a treatment plan that focused on the reduction of unsafe behaviors. Her goals included discussing her early warning signs of overwhelm [sic] (physically, emotionally, mentally), pinpointing triggers, identifying healthy coping skills to help her self-regulate, and identifying skills she could use with caregivers and peers to help her co-regulate. Overall it was difficult for her to grasp new concepts and skills in therapy and needed me to break down the concepts into concrete steps to healthier choices.

Due to her persistent patterns of self-harm, physical aggression with staff, running away from staff, and overall unsafe behaviors, [S.B.] was formally dismissed from our program as there were legitimate concerns in regard to staff's ability to keep her safe in our level of care. Due to her history of these unsafe behaviors at home and in multiple treatment programs of varying levels of care, a 24-hour, higher level of care in a residential facility will be necessary to help [S.B.] to stay safe and achieve significant and lasting improvement of her mental health condition. I consider this to be a medically necessary treatment course.

31. Jamis Leeper, DNP, APRN, PMHNP-BC, wrote in a letter dated March 24, 2021:

[S.B.] presented after discharging from an inpatient assessment and treatment program where she was diagnosed with major depressive disorder, recurrent severe (F33.2), generalized anxiety disorder (F41.1) and neurobehavioral disorder associated with Prenatal alcohol exposure (ND-PAE).

During her stay at Heritage, she struggled with ongoing depressive symptoms, self-harm, and suicidal ideation. She also presented with impulsivity and required physical holds for her safety on multiple occasions. Her mood stabilizer dose was increased as well as trialing medication for anxious symptoms, both scheduled and PRN. Her behaviors continued to fluctuate and often escalated. She struggled with med compliance and attempted to take medications other than as prescribed. Due to the poor response to psychotherapeutic and psychopharmacologic interventions during her stay, she was discharged to another program more suitable for her symptoms and behaviors.

In my opinion, at the time of her discharge from Heritage on October 28, 2021 [S.B.] required a higher level of care than we could provide in order to not only treat her symptoms, but to maintain safety for [S.B.] and those around her.

32. Jill Rickel, MS, CEP, and Amber Quintero wrote in an April 2021 letter:

On July 24th, 2020, [S.B.] enrolled at The Heritage Community SPARKS Program, a residential treatment center, in Provo, UT that specializes in neuro-diverse students. While at Heritage RTC, [S.B.] was under the care of therapist Brianna Davis, LCSW. During this time, [S.B.] received intense clinical care, however it became apparent that her continued aggression, self-harm, and safety concerns did not subside with the behavioral interventions put into place. It was determined by Jill and Amber, the Heritage team, and Mr. and Mrs. [B.] that [S.B.]'s needs were not being met, that Heritage RTC could not keep [S.B.] safe, and she would benefit from a program which specializes in adoption and attachment.

[S.B.] enrolled in the pre-teen program at Change Academy of the Ozarks (CALO) in Lake Ozark, MO on October 30th, 2020. CALO specializes in children who are adopted, have attachment disruptions, and severe dysregulation. [S.B.] is

currently under the care of her therapist, Sylvia Lawson-Cook, LMSW, and other staff at CALO. This consultant is monitoring the case via consistent communication with staff. It has been determined by the CALO team that [S.B.] is an excellent candidate for the program but without completing it in its entirety, [S.B.] remains a serious risk for a return to previous dangerous behaviors and mental health issues. As experts in child/adolescent residential placement and after 14 years in this field having served hundreds of clients, it is the professional opinion of the consultants at AO Therapeutic Consulting Inc. that [S.B.] was, and remains, in need of the highest level of clinical care in a residential treatment center, namely CALO.

33. R.B. wrote that it was the opinion of all of S.B.'s treating professionals that extended treatment at the residential level of care was both necessary and appropriate. He stated that he was concerned that New Directions was attempting to supersede the opinions of the medical professionals who had worked with S.B. on a firsthand basis and had actively witnessed the deterioration of her condition.

34. R.B. included copies of S.B.'s medical records from her prior treatment at Trails, St. Charles Medical Center, UNI, and New Leaf with the appeal. These records unambiguously recommended further care and documented incidents such as S.B. self-harming (including an incident where she repeatedly cut herself with scissors), being physically aggressive towards others, and threatening to kill herself by jumping off of a balcony.

35. R.B. argued that while S.B.'s instances of self-harm had declined from two to three episodes per week to about once a week at the time New Directions denied payment for her treatment, that did not mean that R.B. was safe enough to be discharged. He included copies of S.B.'s medical records at Heritage to show that care remained necessary. S.B.'s records at Heritage document instances such as drinking hand sanitizer, self-harm, crushing and snorting medication, hallucinations, and suicidal ideation.

36. R.B. asked, in the event the denial was upheld, to be provided with a copy of all documents under which the Plan is operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these had been used), as well as any reports or opinions concerning the claim from any physician or other professional, together with their names, qualifications, and denial rates. (collectively the "Plan Documents")

37. In a letter dated July 2, 2021, New Directions upheld the denial of payment for S.B.'s treatment. The letter stated that the denial had been upheld as the treatment had not been found to be medically necessary. The letter elaborated by stating that:

> Specifically, the clinical information that New Directions received did not meet Medical Necessity according to New Directions Medical Necessity Criteria for Psychiatric Residential Criteria. After reviewing New Directions Medical Necessity Criteria that takes into account age, progress of treatment, diagnosis and other programs available, we have determined that your care can be provided in a less intensive setting, such as Psychiatric Partial Hospitalization due to the following reason(s):

> Heritage Residential Treatment Center asked for approval to provide care for you. The care team provided information. You were not making progress in treatment and your treatment team did not change your treatment plan. You were not engaged in treatment. Your condition was unlikely to improve with the current treatment plan. Please follow up with your care team for the next steps in your care.

**CALO**

38. S.B. was admitted to CALO on October 30, 2020, after she was asked to leave Heritage due to the program's concern that they would be unable to keep her safe.

39. In a series of Explanation of Benefits statements BCBSMI denied payment for the treatment at CALO under the following denial codes:

Y638: THE PROVIDER'S BLUE CROSS BLUE SHIELD PLAN HAS NO PARTICIPATING CONTRACT WITH THIS PROVIDER. IF THIS PROVIDER SENDS YOU A BILL, YOU SHOULD EXPECT TO PAY THE DIFFERENCE BETWEEN THE CHARGE AND OUR PAYMENT.

M608: YOUR HEALTH CARE COVERAGE DOESN'T PAY FOR THIS SERVICE; IT'S NOT A BENEFIT WHEN PERFORMED BY A NON-PARTICIPATING PROVIDER. YOU SHOULD EXPECT A BILL FOR THE TOTAL CHARGE FROM THIS HEALTH CARE PROVIDER.

40. On June 18, 2021, R.B. submitted an appeal for the denial of payment of S.B.'s treatment. He asked for a full, fair, and thorough review and that his ERISA rights be respected. R.B. asked that the reviewers have experience treating teens with S.B.'s diagnoses, and that they be trained in the details of MHPAEA.

41. R.B. voiced his concern that BCBSMI's denial was a violation of MHPAEA. He wrote that MHPAEA compelled insurance plans to ensure that coverage for mental health coverage was offered at parity with analogous medical or surgical treatment. R.B. identified skilled nursing, rehabilitation, and inpatient hospice as some of the medical/surgical analogues to the mental health treatment S.B. received at CALO.

42. R.B. shared a report from Milliman Inc. entitled *Addiction and Mental Health vs Physical Health: Widening Disparities in Network Use and Provider Reimbursement,* which found that children in need of mental healthcare treatment were more than ten times more likely to receive treatment at an out-of-network facility than if they had instead needed care in an analogous medical or surgical facility. In addition, insurers were significantly more likely to pay substandard, below-Medicare-rates for the mental health services they did cover.

43. R.B. wrote that he would never have needed to select an out-of-network facility in the first place if BCBSMI had adequate in-network facility eligibility. He asked BCBSMI to

conduct a MHPAEA compliance analysis on the Plan and asked to be provided with physical copies of the results of this analysis.

44. R.B. wrote that his plan was a "Preferred Provider Organization" (PPO) healthcare plan that he had purchased specifically due to the flexibility which was supposedly available to receive out-of-network care.

45. R.B. wrote that his insurance plan booklet stated that out-of-network residential services would be covered at a 60% rate. In addition, his *Benefits at a Glance* booklet and *Member Handbook* also stated that coverage was available for out-of-network mental health services.

46. R.B. wrote that CALO met BCBSMI's definition of an "out-of-network provider" as well as a "nonparticipating provider," however when he examined his insurance plan booklet closely, he saw that it also included language stating that residential treatment was only covered if it was rendered by a participating Blue Cross Blue Shield entity.

47. R.B. contended that because of this provision, he had paid a premium that was around 40% higher to purchase a PPO plan, only to end up with a plan that offered coverage consistent only with an HMO plan.[1]

48. R.B. accused BCBSMI of knowingly engaging in deceptive "bait and switch" tactics.

49. He asked BCBSMI to disclose why he was not receiving the benefits he had paid for and why it advertised the Plan as a "PPO" plan when it actually provided more restrictive "HMO" type benefits for mental health treatment.

---

[1] HMO plans are generally significantly more restrictive than PPO plans when determining whether a service is covered and often exclude coverage for non-emergency out-of-network care entirely. The Plan at issue in this case is a PPO plan, which typically provide coverage, albeit at lower payment rates, for out-of-network care.

50. He again asked for a copy of the Plan Documents and asked that if BCBSMI did not

   possess these materials that it forward his request to the appropriate entity.

51. In a letter dated July 28, 2021, BCBSMI upheld the denial of payment for S.B.'s

   treatment. The letter stated in pertinent part:

> You and your family are covered under the *Simply Blue HSA with Prescription Drugs Embedded Cost-Sharing Group Benefits Certificate ASC*. As noted in your appeal, page 23 of the *Certificate* explains that we provide benefits for psychiatric residential treatment when provided by a facility that participates with BCBSM (if located in Michigan) or with the provider's local Blue Cross Blue Shield plan (if located outside of Michigan).
>
> I confirmed that the provider of your daughter's care and treatment, Change Academy at Lake of the Ozarks, does not participate with Blue Cross Blue Shield. As such, the denial of payment is appropriate.
>
> You indicate in your appeal that enrolled in a PPO (Preferred Provider Organization) health care plan for the "flexibility of coverage and the ability to go out-of-network". However, there is a significant difference between a provider who is out-of-network and one who does not participate with Blue Cross. Pages 114 through 121 of your *Certificate* helps [sic] to explain the difference.
>
> Page 114 of the *Certificate* explains that <u>out-of-network providers</u> do not have an agreement with Blue Cross to provide services through the PPO program. Covered services provided by out-of-network providers are often subject to higher member cost share requirements.
>
> However, <u>nonparticipating providers</u> have not signed agreements to participate with Blue Cross or any of its provider networks. Pages 24, 114, 120 and 121 of the *Certificate* explains that we do not pay for services at non-participating facilities, including:
>
> > -hospitals
> > -inpatient substance abuse treatment facilities
> > -outpatient physical therapy facilities
> > -outpatient psychiatric care facilities
> > -psychiatric residential facilities
> > -freestanding ESRD facilities
> > -home health care agencies
> > -hospice programs
> > -long term acute care hospitals
> > -skilled nursing facilities
> > -ambulatory infusion centers or home infusion centers

Regarding your concerns about the Mental Health Parity Act, the Mental Health Parity Act of 1996 (MHPA) and the Mental Health Parity and Addiction Equity Act of 2009 (MHPAEA) prevents [sic] group health plans and health insurance issuers that provide mental health or substance use disorder (MH/SUD) benefits from imposing less favorable benefit limitations on those benefits than on medical/surgical benefits. Specifically, the Acts include the following provisions:

-If a group health plan or health insurance coverage includes medical/surgical benefits and MH/SUD benefits, the financial requirements (e.g. deductibles and co-payments) and treatment limitations (e.g., number of visits or days of coverage) that apply to MH/SUD benefits must be no more restrictive than the predominant financial requirements or treatment limitations that apply to substantially all medical/surgical benefits.

-MH/SUD benefits may not be subject to any separate cost-sharing requirements or treatment limitations that only apply to such benefits.

-If a group health plan or health insurance coverage includes medical/surgical benefits and MH/SUD benefits, and the plan or coverage provides for out-of-network medical/surgical benefits, it must provide for out-of-network MH/SUD benefits.

-Standards for medical necessity determinations and reasons for any denial of benefits relating to MH/SUD benefits must be disclosed upon request.

BCBSM has acted in accordance with the Mental Health Parity Acts and the provisions set forth in the *Certificate*. To clarify, the *Certificate* provides benefits for care at a psychiatric residential facility when services are provided at an in-network PPO or out-of-network PPO facility. Because the contract does not include benefits for treatment at a nonparticipating facility, we cannot approve payment.

52. The Plaintiff exhausted his pre-litigation appeal obligations under the terms of the Plan and ERISA.

53. On January 5, 2023, R.B. made one last request to BCBSMI, New Directions, and the Plan Admin to request a copy of the documentation to which he was entitled but had yet to receive. In particular, he asked to be provided with:

- Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for my daughter, [S.B.], at Heritage and CALO, and copies of

those individuals' *curriculum vitae*, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for [S.B.]'s claim;

- A complete copy of both the medical necessity criteria utilized by BCBSMI in determining that [S.B.]'s treatment was not medically necessary and that treatment for her at a lower level of care was appropriate;
- A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment. This is necessary to allow me to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;
- Copies of documents identifying the self-compliance analysis the Plan and BCBSMI have carried out to determine the extent to which they are complying with the federal Mental Health Parity and Addiction Equity Act.
- Complete copies of any and all internal records compiled by BCBSMI and Northpointe Bank in connection with [S.B.]'s claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;
- A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [S.B.]'s insurance plan is operated;
- Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the plan administrator, and BCBSMI; and
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

54. Defendants partially complied with this request and R.B. received documentation such as denial letters, mental health and substance use criteria, and medical records. While the production was fairly voluminous, it did not provide many of the materials R.B. requested and largely consisted of letters which Defendants had previously provided and records which R.B. had submitted with his appeals.

55. The denial of benefits for S.B.'s treatment was a breach of contract and caused R.B. to incur medical expenses that should have been paid by the Plan in an amount totaling over $700,000.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

56. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BCBSMI, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

57. BCBSMI and the Plan failed to provide coverage for S.B.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

58. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

59. BCBSMI and the agents of the Plan breached their fiduciary duties to S.B. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in S.B.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of S.B.'s claims.

60. The actions of BCBSMI and the Plan in failing to provide coverage for S.B.'s medically necessary treatment are a violation of the terms of the Plan.

61. In addition, BCBSMI's denial of the services at CALO reveals that while BCBSMI sells and markets its PPO insurance plans as if they offer national coverage which includes

treatment at out-of-network and non-participating providers, in practice, BCBSMI greatly restricts the availability of these benefits in a manner that is inconsistent with the materials provided to plan participants and beneficiaries that purport to disclose the terms of the Plan.

62. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first, second, and third causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

63. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of BCBSMI's fiduciary duties.

64. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

65. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

66. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on

medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

67. The criteria used by BCBSMI for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

68. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for S.B.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

69. When BCBSMI and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

70. BCBSMI and the Plan evaluated S.B.'s mental health claims using criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

71. To illustrate BCBSMI's violation of MHPAEA, R.B. argued that BCBSMI utilized factors to intentionally limit the availability of mental healthcare services. R.B. requested materials from BCBSMI which would have allowed him to allege this with more specificity, but he was not provided with them.

72. Specifically, for residential treatment facilities providing mental health and substance use disorders, BCBSMI and the Plan fail to provide a comparable degree of network residential treatment facilities compared to the degree of network skilled nursing and inpatient rehabilitation facilities.

73. The failure by BCBSMI and the Plan to provide adequate network facilities for sub-acute inpatient treatment of mental health and substance use disorders compared to the network facilities for sub-acute inpatient treatment of medical and surgical disorders resulted in a coverage disparity that violates MHPAEA.

74. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BCBSMI, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

75. BCBSMI and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, and apart from a statement that BCBSMI was compliant with the statute, Defendants did not address in any substantive capacity the Plaintiff's allegations that they were not in compliance with MHPAEA.

76. In fact, despite R.B.'s request that BCBSMI and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, BCBSMI and the Plan have not provided R.B. with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, BCBSMI

and the Plan have not provided R.B. with any information about the results of this analysis.

77. The violations of MHPAEA by BCBSMI and the Plan are breaches of fiduciary duty and also give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for his loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for his loss arising out of the Defendants' violation of MHPAEA.

//

## THIRD CAUSE OF ACTION

### (Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c))

78. BCBSMI, acting as agent for the Plan Admin, is obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan and BCBSMI, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facilities.

79. In spite of R.B.'s requests during the appeal process for BCBSMI to produce the documents under which the Plan was operated, and his instructions to forward that request to the appropriate entity if BCBSMI was not acting on behalf of the Plan Admin in this regard, BCBSMI repeatedly failed to produce to the Plaintiff the documents under which the Plan was operated, including but not limited to any administrative service agreements between the Plan and BCBSMI, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facility treatment within 30 days after they had been requested.

80. After BCBSMI repeatedly failed to provide these materials, R.B. sent one final letter dated January 5, 2023, to both BCBSMI and the Plan Admin again requesting the documents which he was statutorily entitled to receive upon request. BCBSMI and the Plan Admin only partially complied with R.B.'s request for documents.

81. The failure of the Plan Admin and its agent BCBSMI, to produce the documents under which the Plan was operated, as requested by the Plaintiff, within 30 days of R.B.'s request for ERISA documents, provides the factual and legal basis under 29 U.S.C.

§1132(a)(1)(A) and (c) for this Court to impose statutory penalties up to $110 per day on the Plan Admin from 30 days from the date of each of these letters to the date of the production of the requested documents.

82. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for S.B.'s medically necessary treatment at Heritage and CALO under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3. For an award of statutory penalties of up to $110 a day against the Plan Admin after the first 30 days for each instance of the Plan Admin and its agent BCBSMI's failure or refusal to fulfill their duties, to provide the Plaintiff with the documents he had requested.

4. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5. For such further relief as the Court deems just and proper.

DATED this 10th day of February, 2023.

By ____s/ Brian S. King_____
Brian S. King
Attorney for Plaintiff

County of Plaintiff's Residence:
Palm Beach County, Florida.